UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Mark Oldfield and Patricia Oldfield,
*Individually and Derivatively on Behalf of*
*Zeus Electric Chassis, Inc.*,

        Plaintiffs,

v.

Drake Enterprises, Ltd., and Jamie Stiles,

        Defendants.

File No. 25-cv-2774 (ECT/DLM)

**OPINION AND ORDER**

---

Joseph J. Cassioppi and Maliya Gabrielle Rattliffe, Fredrikson & Byron, P.A., Minneapolis, MN, for Plaintiffs Mark Oldfield and Patricia Oldfield.

Leah Natalie Kippola-Friske, Amy J. Swedberg, and Annika Cushnyr Misurya, Maslon LLP, Minneapolis, MN, for Defendants Drake Enterprises, Ltd. and Jamie Stiles.

---

Plaintiffs Mark and Patricia Oldfield were shareholders and creditors of a company called Zeus Electric Chassis, Inc.  In this diversity case, the Oldfields claim that another Zeus shareholder and creditor, Defendant Drake Enterprises, Ltd., and Drake's Chief Executive Officer and President, Defendant Jamie Stiles, acted unlawfully to damage Zeus and the Oldfields' financial interests in Zeus.  The Oldfields assert claims on their own behalf, and they assert claims derivatively on Zeus's behalf.  The core contention is that Drake breached fiduciary duties it owed to Zeus and the Oldfields.

Drake and Stiles seek the case's dismissal.  Stiles's front-line position is that he is not subject to personal jurisdiction in Minnesota.  He seeks dismissal on this ground under

Federal Rule of Civil Procedure 12(b)(2).  Drake's position is that the Oldfields' claims fail on their merits and are dismissal-worthy under Rule 12(b)(6).  Stiles and Drake are right on both fronts.  The Complaint's allegations and record evidence, construed in a light most favorable to the Oldfields, do not show that Stiles had or maintained contacts with Minnesota sufficient to warrant the exercise of personal jurisdiction over him in this District.  And the Complaint does not allege facts plausibly showing that Drake owed a fiduciary duty to Zeus or the Oldfields, or that Drake acted unlawfully in any other way.

I[1]

Zeus is incorporated under Delaware law and maintains its principal place of business in White Bear Lake, Minnesota.  Compl. [ECF No. 1] ¶ 4.[2]  It develops "medium-duty chassis-cab electric vehicle platforms."  *Id.* ¶ 9.  Though Zeus was founded in 2018,

---

[1]    In accordance with the standards governing Rule 12(b)(6) motions, the facts are drawn entirely from the operative Complaint and documents embraced by it.  *Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022).  "In general, materials embraced by the complaint include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings."  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation modified).  Courts "additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned," without converting the motion to one seeking summary judgment under Rule 12(d).  *Id.* (citation modified).

[2]    The Complaint is attached as Exhibit 1 to Defendants' Notice of Removal.  *See* ECF No. 1 at 10–22.  The Complaint was not assigned its own docket number on the Court's CM/ECF system.  For simplicity's sake, the Complaint will almost always be cited only by reference to paragraph numbers within the document.  If a page cite is necessary to the Complaint or any other document, it will be to pagination assigned by CM/ECF, not a document's original pagination.

*id.*, it "remains in a product development stage and relies solely on outside debt and equity financing to fund that development and pay its other expenses," *id.* ¶ 13.

Prior to the events that prompted them to bring this case, the Oldfields were Zeus shareholders and creditors, and Mark Oldfield served on Zeus's Board of Directors. *Id.* ¶ 10. "In 2021, the Oldfields invested $1,145,366 in Zeus in exchange for 266,427 shares of common stock and 572,683 Series A Preferred Shares." *Id.* ¶ 14. "In 2022, the Oldfields invested $1,094,684 in Zeus in exchange for 273,671 in [sic] Series A Preferred Shares." *Id.* ¶ 15. All told, the Oldfields owned 9.34% of the company. ECF No. 10-1 at 58.[3] Separately, "the Oldfields made more than $1.1 million in secured loans to Zeus, via two separate promissory notes." Compl. ¶ 16. Zeus made no payments on these loans. *See id.* ¶ 18.

Like the Oldfields, Drake was a Zeus shareholder and creditor. It owned 9.95% of the company. ECF No. 10-1 at 58. And through a series of loans totaling $4.85 million,

---

[3]    This percentage-of-ownership figure appears in an exhibit to a "Series A Preferred Stock Purchase Agreement." *See* ECF No. 10-1 at 11–117. The Oldfields did not dispute the 9.34% ownership figure the document attributes to them or that that this document may be considered in the Rule 12(b)(6) motion's adjudication, presumably because it is integral to the Oldfields' claims and authentic.

*see* ECF No. 10-1 at 119, 121, 133, 135, 147, 149, 176, 178, 191, 193, 205, 207, 219, 220–21, 233, 234–35, 247, 249,[4] it held first-priority liens on Zeus's assets, ECF No. 10-1 at 3.[5]

In July 2024, Zeus identified a potential funding or investment source—Tingyu Tech. Compl. ¶ 21. Tingyu is "a Chinese-controlled company." *Id.* Individuals associated with Zeus and Tingyu met, though the Complaint does not say when or where. *See id.* ¶¶ 21–23. Stiles and a Zeus Board member named Steve Snyder attended the meeting. *Id.* ¶ 23. "[D]uring the meeting, Drake, Stiles, Snyder, and Tingyu decided that, prior to Tingyu providing funding to Zeus, the parties would attempt to wipe-out the interests of all other investors and lenders of the company," including the Oldfields' interests as Zeus shareholders and creditors. *Id.* ¶ 24.

In January 2025, after Zeus defaulted on the Drake promissory notes, ECF No. 10-1 at 3 (describing Zeus's default as "undisputed"), Drake filed a breach-of-contract suit against Zeus in Ramsey County District Court, *id.* Drake sought appointment of "a general receiver for the purposes of operating, liquidating and selling Zeus's assets . . . and distributing the proceeds." *Id.*; *see* Compl. ¶ 25.

---

[4] The $4.85 million figure is drawn from a series of convertible secured promissory notes from Zeus to Drake. *See* ECF No. 10-1 at 119–260. Again, these documents seem integral to the Oldfields' claims, and there is no dispute regarding the documents' authenticity or that they may properly be considered.

[5] The first-priority nature of Drake's liens is drawn from a Ramsey County (Minnesota) District Court order filed in a receivership proceeding Drake brought against Zeus. *See* ECF No. 10-1 at 2–9. More on that proceeding in a bit. For purposes of showing the appropriateness of drawing this fact from that order, it is enough to know (1) that the order is a matter of public record, and (2) the Oldfields appeared in that proceeding as objectors, *id.* at 2–3, and did not dispute the first-priority characterization of Drake's liens either before the Ramsey County District Court, *see id.* at 6–9, or here, *see* ECF No. 18.

Drake brought the case and sought a receivership to accomplish the goal it shared with Tingyu "of wiping out all other" Zeus investors and creditors. Compl. ¶ 25. "After receivership proceedings were initiated, Tingyu agreed to an investment deal with Drake, where Drake would contribute $4.9 million and Tingyu would contribute $5.1 million, thereby establishing a new company with a 51%–49% ownership split." *Id.* ¶ 26.

"During the receivership proceedings, Drake and Stiles did not act with the intention of maximizing Zeus'[s] value." *Id.* ¶ 28. Stiles fired "key" Zeus officers, one of whom was responsible for securing investor funding. *Id.* ¶¶ 28–29. And Drake and Stiles's prioritization of their Tingyu business plan caused Zeus to miss out on a more-than-$20 million chassis-cab purchase order from a California-based truck-equipment business called One Stop Truck & Equipment and to pass on a $15 million investment from an Ireland-based entity called Wingmen Limited. *Id.* ¶¶ 30–33.

On May 29, 2025, the Ramsey County District Court entered an order approving the sale of Zeus's assets to Drake. *Id.* ¶ 34; *see* ECF No. 10-1 at 2. In a memorandum accompanying the order, Ramsey County District Judge Laura Nelson described the factual and procedural background of the receivership proceedings. ECF No. 10-1 at 3–5. Judge Nelson explained it was "undisputed Drake [held] a first-priority security interest in" Zeus's assets and that Zeus owed Drake "over $6 million." *Id.* at 3. She also noted it was "undisputed the Oldfields [held] a second-priority security interest" in Zeus's assets. *Id.* at 4.

Judge Nelson described the receiver's bidding process. She explained the receiver "attempted to solicit bids from 298 parties," but received qualifying bids from only Drake

5

and 6IXTY Holdings Truck Group, LLC, and a non-qualifying bid from ZMD Acquisitions, LLC. *Id.* The receiver selected Drake's bid as the baseline bid, Judge Nelson explained, "because it exceeded the next highest qualified bid by more than $5 million and contained only minor revisions to the Form [Asset Purchase Agreement] the Receiver had proposed." *Id.* After being informed of the baseline-bid amount, 6IXTY withdrew its bid, leaving Drake as the only qualified bidder. *Id.* Though ZMD attempted to raise its bid before the scheduled auction, this bid was "unaccompanied by any evidence [ZMD] had readily available funds and the financial capability to close the transaction and consummate the purchase of" Zeus's assets, and the new bid "did not include enough cash to pay Drake's first-priority lien." *Id.* at 5. The receiver thus "determined Drake's bid was still the only qualified bid at the time of the auction." *Id.* Drake made a "credit bid in the amount of $6,193,719" at the auction. *Id.* No other party bid, meaning Drake's bid prevailed. *Id.* The receiver sought authorization to sell Zeus's assets to Drake "free and clear of liens and claims that may be asserted against Zeus and its assets." *Id.*

The Oldfields objected to the proposed sale, along with Zeus's former CEO, David Stenson. *Id.* Judge Nelson rejected Stenson's objections because he was an "employee wage creditor," his claim was "unsecured," and the Oldfields' claim was "superior to Stenson's, [so] if the Receiver [met] its burden as to the Oldfields, it also [would] meet[] the burden as to Stenson." *Id.* at 6. Judge Nelson rejected the Oldfields' objections on essentially four grounds: (1) No one "objected to the Receiver's characterization of Zeus's financial viability or the request for an expedited sale," and because Zeus was "not projected to make any profit prior to 2026, there [was] no way for the Oldfields to realize

6

a greater amount than the proposed sale within a reasonable time other than through a sale with a higher purchase price." *Id.* at 7.  (2) The potential Wingmen Limited investment was "not a binding contract" or "a concrete cash offer" resulting in a commitment to invest money in Zeus.  *Id.*  (3) The receiver "successfully demonstrated it [was] unlikely to receive a higher bid . . . within a reasonable time," meaning the Oldfields were "unlikely to realize a greater amount within a reasonable time in the absence of the sale." *Id.* at 8.  (4) The Asset Purchase Agreement under which Zeus's assets would be transferred to Drake did not "release any claims the Oldfields may have against Drake." *Id.* at 8–9.  Judge Nelson's order approving the sale of Zeus's assets to Drake was not appealed.  *See* Docket, *Drake Enterprises, Ltd. v. Zeus Electric Chassis, Inc.*, No. 62-CV-25-411 (Minn. Dist. Ct.) (last visited Dec. 20, 2025).

Roughly two weeks after Judge Nelson issued her order, the Oldfields served Drake and Stiles with the Summons and Complaint in this case.  *See* ECF No. 10-1 at 2; ECF No. 1 at 1 ¶ 1.  The Oldfields assert six claims in this case.  (1) Derivatively on Zeus's behalf, they claim Drake breached fiduciary duties it owed to Zeus.  Compl. ¶¶ 36–42 (Count I). (2) Derivatively on Zeus's behalf, they claim Stiles aided and abetted Drake's breach of the fiduciary duties it owed to Zeus.  *Id.* ¶¶ 43–50 (Count II).  (3) Derivatively on Zeus's behalf, they claim Drake and Stiles tortiously interfered with Zeus's prospective business relationships in the One Stop Truck & Equipment order and the Wingmen Limited investment.  *Id.* ¶¶ 51–56 (Count III); *see* ECF No. 18 at 22.  (4) On their own behalf, the Oldfields claim Drake breached fiduciary duties it owed to the Oldfields.  *Id.* ¶¶ 57–62 (Count IV).  (5) On their own behalf, the Oldfields claim Stiles aided and abetted Drake's

breach of the fiduciary duties it owed to the Oldfields. *Id.* ¶¶ 63–69 (Count V). (6) The Oldfields claim Drake and Stiles tortiously interfered with prospective business relationships the Oldfields had arising from their "business relationship with Zeus that contemplate[d] a return on their investment in the company." *Id.* ¶¶ 70–75 (Count VI). For relief, the Oldfields seek "restitution [and] disgorgement of all illicit proceeds generated as a result of" Defendants' "wrongful conduct," a "money judgment" in favor of Zeus and the Oldfields each, attorneys' fees and costs, and "other relief as the Court deems just, proper, and equitable." *Id.* at 20–21 ¶¶ 1–5 (following the "WHEREFORE" clause).

## II

The first issue is whether there is personal jurisdiction over Stiles. The short answer is that the Oldfields have not carried their burden on this issue because the Complaint does not allege facts plausibly showing Stiles had suit-connected Minnesota contacts that satisfy constitutional due process. As straightforward as that short answer might sound, the path to it is somewhat unusual and takes some explaining.

### A

Start with the basics. "Personal jurisdiction . . . is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (citation modified). "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted).

The plaintiff's burden depends on the nature of a defendant's challenge. A defendant may challenge personal jurisdiction by asserting that the plaintiff hasn't carried his pleading burden. In this procedural context, the question is whether the facts alleged in the complaint, assumed to be true, plausibly show that the defendant is subject to jurisdiction in the plaintiff's chosen forum. *Brothers and Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th Cir. 2022); *Dairy Farmers of Am. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 474–75 (8th Cir. 2012); *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010); *Cambria Co. v. Disney Worldwide Servs., Inc.*, 651 F. Supp. 3d 1073, 1078 (D. Minn. 2023); *see Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 392–393 (D. Minn. 2020) (recognizing that the plausibility standard from *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), applies to personal-jurisdiction allegations). If, on the other hand, "the parties submit affidavits to bolster their positions on the motion, and the district court relies on the evidence, the motion is in substance one for summary judgment." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citations omitted). At this summary-judgment-equivalent stage, a case should not be dismissed for lack of personal jurisdiction "if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Id*. (citation omitted). If the question remains disputed beyond these stages, the plaintiff "must establish [personal] jurisdiction by a preponderance of the evidence at trial or when the court holds an evidentiary hearing." *Id.* (citation modified).

For the exercise of personal jurisdiction to be proper in a diversity case, it must comport with both the forum state's long-arm statute and due process. *Id.* Because Minnesota's long-arm statute, Minn. Stat. § 543.19, is "coextensive with constitutional limits," this two-part issue boils down to one: whether the exercise of personal jurisdiction comports with due process. *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006). Due process requires that each defendant has sufficient "minimum contacts" with the forum state so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (citation modified). This means "actions by the defendant" himself must "create a substantial connection with the forum [s]tate" and provide "fair warning" to the defendant that he may be subject to jurisdiction there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985) (citation modified); *accord, e.g.*, *Creative Calling*, 799 F.3d at 980 (explaining defendant's contacts must permit it to "reasonably anticipate being haled into court" in the forum state (citation modified)). The "fair warning" requirement will be met if the defendant has "purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp.*, 471 U.S. at 472–73 (citation modified).

Our Eighth Circuit Court of Appeals has identified five factors that district courts are to consider in determining whether a defendant has sufficient minimum contacts with the forum state to justify a finding of personal jurisdiction: (1) the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum

for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010). The first three factors are of primary importance, whereas the last two are secondary. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102–03 (8th Cir. 1996).[6] A court must consider these factors in the aggregate rather than individually. *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995) (citation omitted).

The "effects test" described in *Calder v. Jones*, 465 U.S. 783 (1984), is an "additional factor" to be considered in intentional-tort cases. *Kendall Hunt Publ'g Co. v. Learning Tree Publ'g Corp.*, 74 F.4th 928, 931 (8th Cir. 2023). As our Eighth Circuit Court of Appeals has described it, the *Calder* effects test requires a plaintiff to show the presence of three elements: (1) that a defendant's acts were intentional; (2) that the acts "were uniquely or expressly aimed at the forum state"; and (3) that the acts "caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—in the forum state." *Kendall Hunt Publ'g Co.*, 74 F.4th at 931 (citation modified) (quoting *Zazzle, Inc.*, 42 F.4th at 954). The Eighth Circuit "construe[s] the *Calder* effects test narrowly" in the sense that "mere effects in the forum state are insufficient to confer personal jurisdiction." *Arden*, 614 F.3d at 797.

---

[6] "[T]he better understanding of the Eighth Circuit's statements that the last two factors are 'not determinative' or 'not dispositive' is that those factors cannot establish jurisdiction when there are not otherwise minimum contacts with the forum." *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 534 n.3 (D. Minn. 2021) (tracing history of Eighth Circuit's personal-jurisdiction factors).

B

1

Stiles begins his personal-jurisdiction challenge by claiming that his Minnesota contacts occurred only when he performed corporate duties on Drake's behalf, and he argues that these contacts cannot establish personal jurisdiction over him in a personal-capacity damages suit (like this one) brought in Minnesota. *See* ECF No. 9 at 13–14. This contention is based on the "fiduciary shield" exception to personal jurisdiction—as in, a corporate officer owes a fiduciary duty to the corporation, and the officer's actions on behalf of the corporation are excepted from the otherwise applicable long-arm analysis. *Id.* at 13. In a declaration, Stiles testified that all his Minnesota contacts occurred exclusively in his "role as Chief Executive Officer of Drake" and that all his in-Minnesota activities were "for the benefit of and on behalf of Drake." ECF No. 10-1 at 262 ¶ 4. Therefore, Stiles contends, the analysis of the Eighth Circuit's five factors "is straightforward because Plaintiffs have alleged zero personal contacts or contacts made by Stiles in his individual capacity for the Court to analyze." ECF No. 9 at 14. This is not persuasive.

As authority for the fiduciary-shield exception, Stiles cites only *Arkansas Rice Growers Cooperative Association v. Alchemy Industries, Inc.*, 797 F.2d 565 (8th Cir. 1986). In that diversity case, the plaintiff, Arkansas Rice Growers Cooperative Association, claimed that two corporations (Alchemy and Pitt) negligently designed, and breached contracts regarding the construction of, a rice-hull-combustion plant. *See id.* at 567–68. In addition to suing the two corporations, the plaintiff sued twenty-two individuals

who "had personally guaranteed the construction contract, for failure to honor the guarantee." *Id.* at 567, 571.  None of the twenty-two individual defendants was an Arkansas citizen.  *See id.* at 572.  After a non-jury trial, the district court found all defendants liable and awarded damages.  *Id.* at 572–73.  The Eighth Circuit affirmed the district court's liability and damages determinations with respect to the breach-of-contract claims against the corporate defendants.  *See id.* at 567–71.  The Eighth Circuit reversed the district court's judgments against the individual defendants.  *See id.* at 571–74. Applying the Arkansas long-arm statute, the Eighth Circuit held that the district court lacked personal jurisdiction over them.  *See id.* at 573–74.  Nineteen of the twenty-two individual defendants had not been to Arkansas during the transaction.  *See id.* at 572. Regarding these nineteen defendants, the Eighth Circuit explained it had "found no case in which a court has asserted jurisdiction over a nonresident guarantor merely because the guarantor is a passive investor in the corporation whose debt the guarantor assures." *Id.* at 574.  The remaining three individual defendants had been to Arkansas "on one or more occasions" during the transaction.  *Id.*  Regardless, those contacts did not change the court's "holding that there are insufficient contacts between the guarantors and Arkansas either as to the guarantors in general or as to those three particular guarantors." *Id.*  As the Eighth Circuit saw it, "[t]he law is clear that a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity." *Id.* (citations omitted). And, the Eighth Circuit explained, the evidence showed beyond dispute that these three

individual defendants "went to Arkansas on behalf of" a corporate defendant (Alchemy), "not in their individual capacities." *Id.*

It would be a mistake to apply the Eighth Circuit's analysis from *Arkansas Rice Growers* here. (1) The fiduciary-shield exception is not an element of constitutional due process. *Henry Law Firm v. Cuker Interactive, LLC*, 950 F.3d 528, 533 (8th Cir. 2020) ("The United States Supreme Court has 'rejected the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity.'" (citation modified) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984))); *see Newsome v. Gallacher*, 722 F.3d 1257, 1276 (10th Cir. 2013) ("The fiduciary shield doctrine . . . has no necessary connection to the minimum contacts analysis."). If the exception applies, it is because a state legislature incorporated the exception into its long-arm statute, or perhaps the state's courts adopted the exception. *See Newsome*, 722 F.3d at 1276 (recognizing that, "if the fiduciary shield doctrine exists at all, it must be a matter of state law—such as 'a judicial rule of construction for interpreting the intended scope of a state's long-arm statute'" (quoting 3A *Fletcher Cyclopedia of the Law of Corporations* § 1296.20)).

(2) In *Arkansas Rice Growers*, the court applied Arkansas law—*i.e.*, the Arkansas long-arm statute as interpreted by the Arkansas Supreme Court—to resolve the personal jurisdiction question. *See id.* at 572–74. Here, the question depends on Minnesota's long-arm statute and principles applied under it. Though Arkansas may have chosen to narrow its courts' personal jurisdiction through the fiduciary-shield exception, *but see Torchmark Corp. v. Rice*, 945 F. Supp. 172, 176 (E.D. Ark. 1996) (concluding that, if the

14

fiduciary-shield exception ever was part of Arkansas law, amendments to the state's long-arm statute extending its reach to the fullest extent permitted by constitutional due process negated the doctrine in Arkansas), Minnesota has not. The text of Minnesota's long-arm statute says nothing to suggest it includes a fiduciary-shield exception. *See* Minn. Stat. § 543.19. In at least one case, the Minnesota Supreme Court refused to apply the exception and perhaps rejected it outright. *See Real Props., Inc. v. Mission Ins. Co.*, 427 N.W.2d 665, 668 (Minn. 1988). In that case, the court explained that a corporate agent's "own conduct does not merge or disappear when it" acts on the corporation's behalf and that, "[i]n determining the due process value of [the agent's] contacts with Minnesota, we look to what [the agent] actually did, whether what it did was for itself alone or in [the principal's] behalf." *Id.* (citation omitted). A series of persuasive decisions since has recognized that the Minnesota Supreme Court has not adopted the fiduciary-shield exception and is not likely to do so under the Minnesota long-arm statute's current version. *See BioE LLC v. Mediatech, Inc.*, No. 10-cv-2085 (MJD/FLN), 2011 WL 31727, at *4 (D. Minn. Jan. 5, 2011) (recognizing that Minnesota has not adopted the doctrine); *Safco Prods. Co. v. Welcom Prods., Inc.*, 730 F. Supp. 2d 959, 966 (D. Minn. 2010) ("'The Minnesota Supreme Court has given no indication that it is inclined to' adopt the fiduciary shield doctrine." (quoting *M.G. Incentives, Inc. v. Marchand*, No. C6-00-962, 2001 WL 96223, at *5 (Minn. Ct. App. Feb. 6, 2001))); *see also Stratasys, Inc. v. Protopulsion, Inc.*, No. A10-2257, 2011 WL 2750720, at *5 (Minn. Ct. App. July 18, 2011) (recognizing that, while an individual's "status as a corporate officer . . . cannot alone establish sufficient contacts to exercise personal jurisdiction," an individual is not "shielded from personal

jurisdiction simply because his actions were taken in his capacity as CEO." (first citing *State v. Cont'l Forms, Inc.*, 356 N.W.2d 442, 444 (Minn. Ct. App. 1984); and then citing *Oakridge Holdings, Inc. v. Brukman*, 528 N.W.2d 274, 278 (Minn. Ct. App. 1995))). The fiduciary-shield exception does not prevent the exercise of personal jurisdiction over Stiles.

2

As an alternative to the fiduciary-shield exception, Stiles argues that the Complaint does not allege facts plausibly showing that a court in Minnesota may exercise personal jurisdiction over him based on a traditional minimum-contacts analysis. *See* ECF No. 9 at 11, 13–14; *see also* ECF No. 20 at 14–21. Regarding personal jurisdiction specifically, the Complaint alleges:

> Jurisdiction is proper in Minnesota because a substantial part of the events giving rise to the claims in this Complaint occurred in this state. Specifically, Defendants breached their fiduciary duties to the Oldfields based on their conduct related to a Minnesota-based entity, Zeus. As part of their misconduct, Defendants also initiated a receivership action for Zeus in Ramsey County, Minnesota.

Compl. ¶ 7.[7] In their opposition brief, the Oldfields highlight four other allegations in the Complaint that they say show personal jurisdiction over Stiles. These include (as the Oldfields describe and cite them):

- [Stiles] caused Drake to initiate a receivership proceeding in Ramsey County District Court (Compl. ¶ 25);

---

[7] Though the Complaint also alleged that a Zeus stock-purchase agreement triggered personal jurisdiction over Stiles in Minnesota, Compl. ¶ 8, the Oldfields did not rely on this contention to oppose Stiles's Rule 12(b)(2) motion, *see* ECF No. 18 at 7–14.

- [Stiles] requested that the Minnesota court expedite the receivership process (Compl. ¶ 25);

- [Stiles] directed the sale of Zeus's Minnesota-based assets (Compl. ¶¶ 4, 25–26); [and]

- [Stiles's] actions excluded Minnesota residents from the sale and caused harm to a Minnesota-based company and its stakeholders (Compl. ¶¶ 4, 34–35, 55–56).

ECF No. 18 at 8. In addition to these allegations from the Complaint, the Oldfields rely on testimony in a declaration filed by Mark Oldfield. ECF No. 19. In this declaration, Mark testified that he "was informed by a former employee of Zeus that Stiles traveled to Minnesota to meet with representatives from the Chinese company, Tingyu." *Id.* ¶ 2.

a

For fundamental reasons distinct from the Eighth Circuit's multi-factor test, these assertions do not plausibly show there is personal jurisdiction over Stiles in this District in this case. (i) When personal jurisdiction is challenged, a complaint's "conclusory allegations" and legal conclusions are "not enough" to show minimum contacts. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1074 (8th Cir. 2004); *see Zeavision, LLC v. Bausch & Lomb Inc.*, No. 4:21CV1487 HEA, 2022 WL 17092453, at *3 (E.D. Mo. Nov. 21, 2022) (citing cases); *see also Klein v. Toupin*, Civil No. 05-647 (GK), 2006 WL 8446474, at *1 (D.D.C. Feb. 10, 2006) ("Plaintiff's bare assertion that 'upon information and belief,' First American has 'sufficient contacts with the District of Columbia' is merely a legal conclusion which is insufficient to 'constitute the prima facie showing necessary to carry the burden of establishing personal jurisdiction.'" (quoting *Second Amendment Found. v.*

17

*U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001))).   For this reason, the

Complaint's assertion here that "[j]urisdiction is proper in Minnesota because a substantial

part of the events giving rise to the claims in this Complaint occurred in this state," Compl.

¶ 7, does not contribute to showing personal jurisdiction over Stiles.   To the extent it is

factual, the allegation is conclusory.   It identifies no in-Minnesota events in which Stiles

might have participated.   It otherwise asserts a legal conclusion—that is, it repeats a

subsection of the federal venue statute.   *See* 28 U.S.C. § 1391(b)(2) (providing that a civil

action may be venued in "a judicial district in which a substantial part of the events . . .

giving rise to the claim occurred").

(ii) The Complaint's allegation that "Defendants breached their fiduciary duties to

the Oldfields based on their conduct related to a Minnesota-based entity, Zeus," Compl.

¶ 7, does not help, either.   It lumps Stiles with Drake though the law ordinarily requires an

individualized showing of the contacts necessary to support personal jurisdiction.   *See C.*

*Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*, No. 4:20-cv-01444-MTS, 2021 WL

3725680, at \*4 (E.D. Mo. Aug. 23, 2021) (first citing *Borislow v. Canaccord Genuity Grp.*

*Inc.*, No. 14-80134-CIV, 2014 WL 12580259, at \*5 (S.D. Fla. June 27, 2014); and then

citing *Head v. Las Vegas Sands, LLC*, 298 F. Supp. 3d 963, 973 (S.D. Tex. 2018)).   And

the allegation says nothing about any contacts Stiles might personally have had with

Minnesota as part of his Zeus-injuring actions.

(iii) The allegations in the Oldfields' opposition brief are unhelpful because, though

the brief cites the Complaint as the allegations' source, the cited allegations do not mention

Stiles and say nothing about Minnesota contacts he may have had.   In their brief, the

Oldfields cite paragraph 25 of the Complaint for the proposition that *Stiles* "caused Drake to initiate a receivership proceeding in Ramsey County District Court." ECF No. 18 at 8. Paragraph 25 doesn't say that. It says "*Drake* initiated receivership proceedings" in Ramsey County District Court. Compl. ¶ 25 (emphasis added). Similarly, the Oldfields cite paragraph 25 of the Complaint for the proposition that *Stiles* "requested that the Minnesota court expedite the receivership process." ECF No. 18 at 8. Again, the Complaint doesn't say that. It alleges that "*Drake* requested an expedited receivership process due to pressure from Tingyu, which was granted." Compl. ¶ 25. The Oldfields cite paragraphs 4, 34, 35, 55, and 56 of the Complaint for the proposition that Stiles "excluded Minnesota residents from the [receivership] sale." ECF No. 18 at 8. None of these paragraphs mention Stiles specifically or attribute conduct or Minnesota connections to him. *See id.* The Oldfields cite paragraphs 25 and 26 of the Complaint for the proposition that "Stiles directed the sale of Zeus's Minnesota-based assets." ECF No. 18 at 8. Neither paragraph mentions Stiles. Nor does either paragraph allege who "directed" the sale of Zeus's assets in the receivership, other than identifying the court-appointed receiver. Compl. ¶ 25. The bottom line, then, is that, while the Oldfields' opposition brief gives the impression that the Complaint attributes Minnesota contacts to Stiles, the Complaint doesn't do that. It says nothing about Minnesota contacts Stiles may have had either in his capacity as a Drake officer or otherwise. Apart from the Complaint, the Oldfields cite no source or evidence that might support these assertions. And neither the Complaint nor any other material in the record justifies attributing Drake's corporate activities just to Stiles.

(iv) Mark Oldfield's declaration testimony raises different issues. To recap, Mark testified that he "was informed by a former employee of Zeus that Stiles traveled to Minnesota to meet with" Tingyu's representatives. ECF No. 19 ¶ 2. This testimony is hearsay. Fed. R. Evid. 801(c). Some courts have applied the general rule against hearsay in the context of motions challenging personal jurisdiction. *E.g., Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 506 (6th Cir. 2014) ("In general, it is improper for a court to consider hearsay statements when ruling on a motion to dismiss."); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (affirming district court's refusal to consider hearsay evidence to establish personal jurisdiction); *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) ("We may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but we may not rely on . . . hearsay statements contained in the affidavits."); *Miami Prods. & Chem. Co. v. Olin Corp.*, 545 F. Supp. 3d 1, 14 (W.D.N.Y. 2021) ("While it is proper for a court to rely on affidavits to establish jurisdictional facts, hearsay evidence submitted by a plaintiff is not sufficient to defeat a motion to dismiss for lack of personal jurisdiction." (quotation omitted)). Other courts have not. *E.g., Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1562 (Fed. Cir. 1994) (rejecting argument that a hearsay declaration must be disregarded in a personal-jurisdiction challenge); *see Philips Med. Sys. (Cleveland), Inc. v. Buan*, No. 19 CV 2648, 2021 WL 83736, at *3 (N.D. Ill. Jan. 11, 2021) (citing cases on both sides). Here, the better answer is to disregard Mark's declaration testimony. Of the circuits that have addressed the question, a majority forbid or disfavor the consideration of hearsay evidence in this context, and I am persuaded by their reasoning. It is true—as the Federal

Circuit observed in opting to consider hearsay evidence in a personal jurisdiction challenge—that Rule 12 does not include Rule 56's requirement that declarations "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4). *Beverly Hills Fan Co.*, 21 F.3d at 1562 & n.7. But it is also true that the Federal Rules of Evidence apply to this proceeding. Fed. R. Evid. 1101. And regardless, Mark's declaration lacks "sufficient guarantees of trustworthiness" in the sense of the hearsay rules' residual exception. Fed. R. Evid. 807(a)(1). He did not identify the information's source or what basis that individual might have had to know of Stiles's activities. Nor did Mark explain when he learned the information or the circumstances under which he acquired the information. In other words, even if a hearsay statement might properly be considered in the context of a personal-jurisdiction challenge, this isn't the case to do it.

b

With those issues resolved, the remaining analysis is straightforward. With Mark's hearsay testimony excluded, nothing shows Stiles was present in Minnesota for any reason connected to this case's suit-provoking transactions. To be clear, Stiles never denied being in Minnesota at some point before this case was filed, and it seems safe to presume he was. But no allegations or evidence show (i) why he might have been here, (ii) how often he was here, or (iii) the nature or extent of any relationship between the Oldfields' claims in this case and Stiles's Minnesota visits. Even if Mark Oldfield's declaration were considered, it shows only one Minnesota contact, and it is difficult to understand how that one contact might be enough. (iv) Though difficult to quantify, Minnesota has an interest in providing a litigation forum for its citizens, the Oldfields and Zeus. *See K-V Pharm. Co.*

21

*v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 595 (8th Cir. 2011). Regardless, whatever its precise extent here, Minnesota's interest "cannot make up for the absence of minimum contacts." *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 525 (8th Cir. 1996). (v) The convenience to the parties of a Minnesota forum is not obvious. The Oldfields are Florida citizens. ECF No. 1 at 3 ¶¶ 7, 11. Stiles is a North Carolina citizen, *id.* 1 at 3–4 ¶¶ 10–11, and no one suggests he travels regularly to Minnesota.

(vi) The lack of information regarding the extent and nature of Stiles's Minnesota contacts means the Oldfields have not plausibly satisfied *Calder*'s effects test. All we have are allegations and inferences that Stiles knew the Oldfields and Zeus were in Minnesota and would be injured there because of his actions. That is not enough under controlling precedents. *See Elliott Auto Supply Co., Inc. v. Fisher Auto Parts, Inc.*, No. 23-cv-2990 (ECT/DJF), 2024 WL 555139, at *5–6 (D. Minn. Feb. 12, 2024).

The absence of personal jurisdiction over Stiles means the claims asserted against him must be dismissed without prejudice. These include the derivative and direct claims for aiding and abetting a breach of fiduciary duty asserted against just Stiles in Counts II and V, and the derivative and direct claims for tortious interference with prospective business advantage in Counts III and VI to the extent they are asserted against Stiles.

III

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must

be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Rule 12(b)(6) motion's dispositive question is whether, under Delaware law, the Complaint alleges facts plausibly showing that Drake breached a fiduciary duty. (1) The parties agree Delaware law applies to the breach-of-fiduciary-duty claims. *See* ECF No. 9 at 16; ECF No. 18 at 15. This is because the state of incorporation's law governs the fiduciary duties owed by a corporation's directors and shareholders. *Trooien v. Mansour*, 608 F.3d 1020, 1032 (8th Cir. 2010); *CH Bus Sales, Inc. v. Geiger*, No. 18-cv-2444 (SRN/KMM), 2019 WL 1282110, at *7 n.11 (D. Minn. Mar. 20, 2019). Here, Zeus was incorporated under Delaware law. ECF No. 1 at 3 ¶ 8. (2) And the parties agree that a breach of fiduciary duty is essential, not just to the breach-of-fiduciary duty claims, but also to the tortious-interference claims. Unlike the breach-of-fiduciary-duty claims, the parties agree Minnesota law governs the tortious-interference claims. *See* ECF No. 9 at 22–23; ECF No. 18 at 22. Under Minnesota law, a claim for tortious interference with prospective economic advantage requires a plaintiff to show, among other elements, that the "defendant intentionally interfered with [the] plaintiff's reasonable expectation of economic advantage, *and the intentional interference is either independently tortious* or in violation of a state or federal statute or regulation." *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) (emphasis added). Here,

the breach of fiduciary duty is the only "independently tortious" conduct identified to support the tortious-interference claim. *See* ECF No. 18 at 22.[8]  In other words, no fiduciary breach means no tortious-interference claim.[9]

The Complaint alleges that Drake breached fiduciary duties it owed to Zeus and the Oldfields arising from its status "[a]s an owner and investor of Zeus," Compl. ¶¶ 37, 58, so the starting point is what Delaware law says about fiduciary duties owed by a corporation's shareholders because they are shareholders.  "As a general rule" under Delaware law, "stockholders do not owe fiduciary duties to the corporation or its stockholders and are free to act in their self-interest."  *In re Oracle Corp. Derivative Litig.*, 339 A.3d 1, 19 (Del. 2025).  In this same case—*In re Oracle Corp.*—the Delaware Supreme Court summarized Delaware law in this area as follows:

> [A] stockholder who owns or controls over 50% of a Delaware corporation's stock is presumed to exercise "hard" control and assumes fiduciary duties in certain circumstances.  This is because a majority stockholder controls the levers of power within the corporation.  As we have said before, "[i]n addition

---

[8]    The Complaint is not so explicit.  It alleges that Drake "acted intentionally and wrongfully to interfere with Zeus'[s] prospective business relationships, including by making alternative plans with Tingyu with zero regard for Zeus'[s] value."  Compl. ¶ 54; *see id.* ¶ 73 (alleging that Drake's "alternative plans with Tingyu . . . wiped out the Oldfields' interests").  In their opposition brief, however, the Oldfields seek to establish the "independently tortious" character of Drake's Tingyu-related (and perhaps other) activities by claiming specifically that these activities breached Drake's fiduciary duties to Zeus.  ECF No. 18 at 22.

[9]    If it mattered, the analysis is the same under Delaware law.  There, "[t]he conduct underlying a claim for tortious interference with prospective economic advantage must be wrongful."  *Zimmerman v. Int'l Longshoreman's Ass'n Loc. 1694*, No. 1:22-CV-01192-JCG, 2024 WL 3104957, at *8 (D. Del. June 24, 2024) (citing *KT4 Partners LLC v. Palantir Techs., Inc.*, C.A. No. N17C-12-212 EMD CCLD, 2018 WL 4033767, at *6 (Del. Super. Ct. Aug. 22, 2018)).

to the election of directors, many of the most fundamental corporate changes also require approval by a majority vote of the stockholders, *e.g.*, mergers, consolidations, sales of all or substantially all of the assets of a corporation and dissolutions."

Conversely, a stockholder who owns or controls less than 50% of a corporation's voting power is not presumed to be a controlling stockholder with fiduciary duties. Even so, a minority stockholder can be a controlling stockholder by exercising actual control over the corporation's business affairs or by exercising actual control over a specific transaction.

The test for actual control by a minority stockholder "is not an easy one to satisfy." The minority stockholder must have "a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock." To prove actual control over a specific transaction, a plaintiff must prove that the minority stockholder "exercised actual control over the board of directors during the course of a particular transaction."

*Id.* at 19–20 (citations omitted); *see In re KKR Fin. Holdings LLC Shareholder Litig.*, 101 A.3d 980, 992 (Del. Ch. 2014) ("Delaware case law has focused on control of the board," namely, "the *de facto* power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability *to dominate the corporate decision-making process*." (quotation omitted)).

Though the Delaware Supreme Court described the "control" question as requiring "a fact specific analysis," *In re Oracle Corp.*, 339 A.3d at 21, claims that require a plaintiff to plead control have been dismissed at the Rule 12(b)(6) stage, *see, e.g.*, *Castel S.A. v. Wilson*, No.: 2:19-cv-09336-ODW-(MAAx), 2020 WL 4003024, at *13–14 (C.D. Cal. July 15, 2020); *Xtreme Power Plan Tr. ex rel. DeCaro v. Schindler (In re Xtreme Power Inc.)*,

563 B.R. 614, 643–44 (Bankr. W.D. Tex. 2016); *NHB Assignments LLC ex rel. Liquidating Tr. v. Gen. Atl. LLC (In re PMTS Liquidating Corp.)*, 526 B.R. 536, 542–44 (D. Del. 2014); *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F. Supp. 2d 202, 215–225 (S.D.N.Y. 2012); *Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*, 361 B.R. 369, 390–95 (Bankr. S.D.N.Y. 2007).[10]

The Complaint does not allege facts plausibly showing that Drake was a "controlling stockholder" under Delaware law, meaning it does not plausibly allege Drake owed Zeus a fiduciary duty. Drake owned 9.95% of Zeus's stock, well below the less-than-50% threshold at which the presumption of non-control kicks in. ECF No. 10-1 at 58. If Drake had a seat or seats on the Zeus Board, the Complaint does not allege it. The Complaint does not identify any transaction the Zeus Board pursued over which Drake might have exercised actual control. The Complaint alleges Zeus's Board "members were optimistic and believed Tingyu's involvement would be beneficial for the future of Zeus," Compl. ¶ 22, but it nowhere alleges the Board had anything to do with the ultimate transaction between Drake and Tingyu. To put it another way, a showing of fiduciary-duty-triggering minority-stockholder control under Delaware law depends on

---

[10]    Delaware law seems clear that Drake's creditor status triggers no fiduciary duty. *See Blueacorn PPP, LLC v. Pay Nerd LLC*, 310 A.3d 590, 594 (Del. Ch. 2024) ("Bargained-for commercial relationships between sophisticated parties do not give rise to fiduciary duties."); *see also Starr Int'l Co.*, 906 F. Supp. 2d at 221 ("It is well-settled that, because a creditor-debtor relationship does not, in the ordinary course, entail a creditor's control of a debtor's board, 'as a general rule, there is no fiduciary relationship between a debtor and a creditor … and, therefore, there can be no breach of fiduciary duty.'" (quoting *Keith v. Sioris*, C.A. No. 05C-02-272, 2007 WL 544039, at *7 (Del. Super. Jan. 10, 2007))). If there are cases reaching the opposite conclusion, they have not been cited.

identifying at least (1) a Board-level transaction (2) the minority stockholder effectively controlled. *In re Oracle Corp.*, 339 A.3d at 19–21. The Complaint's theory doesn't fit this legal regime. The Complaint's theory is not that Drake as stockholder *controlled* the Board with respect to the receivership or Tingyu transaction; it is that Drake acted *independently* of the Board, thereby harming Zeus's and the Oldfields' interests. It is difficult to understand how a minority shareholder's independent actions might trigger fiduciary liability under Delaware law on a controlling-shareholder theory.

The Oldfields' arguments on the shareholder-control question are not convincing. In the Oldfields' view, "the Complaint alleges that Drake exercised actual control over the specific transaction at issue—the sale of Zeus's assets through a court-supervised receivership." ECF No. 18 at 17. This does not show shareholder (or, if it counted, creditor control) in the sense Delaware law requires. As far as the Complaint's allegations go, Zeus exercised no control over the receivership's commencement or adjudication—it did not choose to be sued by Drake, elect to be placed in a receivership, or agree to the sale of its assets to Drake. Put differently, these were not transactions Zeus's Board chose to pursue. If Zeus exercised no control, then it is difficult to understand how Drake might have controlled Zeus's board-level decisions regarding the receivership—there was nothing in that sense to control. Regardless, the Complaint and Ramsey County District Court's orders cannot plausibly be understood to show that Drake's commencement of the receivership proceeding was unlawful or improper for any reason. The Oldfields argue that Drake, via Stiles, "exercised general managerial control by removing Zeus's CEO and other key officers during a critical period." ECF No. 18 at 19. As support for this

proposition, the Oldfields cite *Tornetta v. Musk*, 310 A.3d 430 (Del. Ch. 2024). In *Tornetta*, among other post-trial holdings, the court determined that Elon Musk exercised transaction-specific control over the Tesla Motors, Inc. Board's decision to award him significant compensation. *Id.* at 446, 497–520. The court analyzed extensive evidence showing Musk's control, but the court's introductory explanation for this holding is enough for this case's purposes:

> The collection of features characterizing Musk's relationship with Tesla and its directors gave him enormous influence over Tesla. In addition to his 21.9% equity stake, Musk was the paradigmatic "Superstar CEO," who held some of the most influential corporate positions (CEO, Chair, and founder), enjoyed thick ties with the directors tasked with negotiating on behalf of Tesla, and dominated the process that led to board approval of his compensation plan. At least as to this transaction, Musk controlled Tesla.

*Id.* at 446. We don't have anything like that here—that is, the Complaint does not allege facts plausibly showing that the relationship between Drake (or Stiles) and Zeus had anything in common with the relationship between Musk and Tesla. The Oldfields also argue that Drake exercised "general control" over Zeus. ECF No. 18 at 16–17. Delaware law allows for this possibility, *see Tornetta*, 310 A.3d at 500, but the Complaint does not plausibly allege it. It does not allege that Drake held significant equity power or a right to name directors. It does not identify decisional rules that might have enhanced Drake's power. It does not allege that Drake occupied high-status roles within Zeus that might have enhanced its influence with Zeus's Board. *See id.* And if I'm correct that the Complaint does not plausibly allege Drake possessed transaction-specific control over Zeus, it follows logically that general control is not plausibly alleged.

\*

In decisions on Rule 12(b)(6) motions, there is almost always a question whether the Complaint (or the claims in the Complaint that were the subject of the motion) should be dismissed with or without prejudice. *See Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1079–80 (D. Minn. 2021). Here, the opportunity to amend was not requested, meaning the claims that were the subject of the Rule 12(b)(6) motion will be dismissed with prejudice.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** the Motion to Dismiss of Defendants Drake Enterprises, Ltd. and Jamie Stiles [ECF No. 7] is **GRANTED** as follows:

1.    Count II, Count III to the extent it is asserted against Defendant Stiles, Count V, and Count VI to the extent it is asserted against Defendant Stiles are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction.

2.    Count I, Count III to the extent it is asserted against Defendant Drake Enterprises, Count IV, and Count VI to the extent it is asserted against Defendant Drake Enterprises are **DISMISSED WITH PREJUDICE**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 22, 2025                                         s/ Eric C. Tostrud
                                                                                   Eric C. Tostrud
                                                                                   United States District Court